AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
для the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

552 Hamilton Avenue, El Centro, California, 92243

UNSEALED PER ORDER OF COURT

Case No.  18MJ5527

FILED
OCT 22 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, Incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC Section 1324 | Alien Smuggling |

The application is based on these facts:
See Attached affidavit of TFO Emmanuel Ortega, Homeland Security Investigations

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Emmanuel Ortega, HSI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/19/18

City and state: San Diego, CA

_____
Judge's signature

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Emmanuel Ortega, being duly sworn, declare and state as follows:

## Experience and Training

1. I am a United States Border Patrol Agent-Intelligence officer (a "BPA-I") within the United States Department of Homeland Security, Customs and Border Protection, United States Border Patrol (the "USBP"). I have been employed by USBP since June of 2009.

2. I am currently assigned as a Task Force Officer with Homeland Security Investigations Marine Task Force.

3. I am a graduate of the United States Border Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I have received training in investigating alien smuggling activity, identifying immigration violations, and enforcing numerous immigration and customs laws within the United States. I am also cross designated to conduct investigations of violations of Title 21 of the United States Code.

4. I am currently assigned to conduct investigations of criminal violations relating to alien smuggling and narcotics smuggling. I have participated in numerous alien smuggling-related investigations, many of which involved the arrests of persons for alien smuggling offenses. In those cases, I conducted interviews with the arrested persons and with their associates. Through these interviews, I have gained a working knowledge and insight into the activities and operations of alien smugglers.

5. During the course of my employment with USBP, I have participated in a number of investigations, including investigations that have resulted in criminal prosecutions. Aditionally I have made arrests; drafted affidavits for search and seizure warrants, arrest warrants, tracking warrants; prepared reports in state and federal proceedings; and provided sworn statements in state and federal proceedings.

6. Through my training, experience, and discussions with other experienced criminal investigators, I have become familiar with the behavior, speech, routes, and methods of operation of criminal organizations. I have also completed an assignment as a

Task Force Officer with HSI and am currently assigned to the Marine Task Force. This assignment continued to allow me to experience investigations through the various facets of ongoing criminal investigations.

## Purpose of Affidavit

7. This affidavit is made in support of an application for a warrant to search the entire property located at 552 Hamilton Street, El Centro, California 92243, within the Southern District of California, as described more fully in Attachment A (hereinafter the "SUBJECT PREMISES"), for items constituting evidence, fruits, and instrumentalities of violations of Federal laws, namely, Title 8, United States Code, Section 1324 (alien smuggling), as further described in Attachment B.

8. Based on the facts contained in this affidavit and my training and experience, I believe there is probable cause to conclude that located at the SUBJECT PREMISES, as described in Attachment A, are evidence, fruits, and/or instrumentalities of the aforementioned crimes, as described in Attachment B.

9. The facts set forth in this affidavit are based on knowledge obtained from other individuals participating in this investigation (including other law enforcement officers), communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## Probable Cause

10. On October 18, 2018, at approximately 10:00 a.m., BPA-I officers (the "Investigators") assigned to the El Centro Sector Intelligence Unit observed a Saturn Vue Sports Utility Vehicle (the "SATURN") parked at the "Double AA" parking lots in Calexico, California. From my training and experience, I am aware that this parking lot is a location where alien smugglers temporarily park cars that are then used to transport illegal aliens from the border area to "stash houses," or to other cities outside of Imperial County.

I also know that people involved in alien smuggling will use this area instead of driving the smuggling cars into Mexico, thereby avoiding record-keeping that associates the cars with cross-border activity.

11. Investigators began surveillance of the SATURN and watched it travel from the noted parking lot to various roads on the outskirts of Calexico. The investigators followed the SATURN on various roads that are approximately one mile north of the United States / Mexico International Border. At approximately 1:00 p.m., Agents lost sight of the SATURN and ended surveillance.

12. On October 19, 2018, at approximately 8:45 a.m., investigaors again saw the SATURN, now traveling westbound on Interstate 98, west of Weed Road. This intersection is located approximately one mile north of the fence demarcating the international border. I understand from colleagues that that this is an area often used by alien smugglers to pick up illegal aliens that have just crossed into the United States.

13. At approximately 8:55 a.m., the investigators lost sight of the SATURN near the intersection of Interstate 98 and Clark Street. Based on the location where the investigators last saw this car, they drove north to El Centro, California to try to relocate it. The investigators drove towards El Centro because, as I am aware from my experience, alien smugglers use homes in El Centro (and elsewhere) – commonly known as "stash houses" – to hold illegal aliens before the aliens travel to other parts of the United States.

14. At approximately 9:15 a.m., investigators again saw the SATURN, now parked in the parking lot of the El Centro Regional Medical Hospital. The investigators maintained surveillance and saw what appeared to be three or four passengers inside it. At approximately 9:30 a.m., investigators also saw a Black Chrysler 300 (the "CHRYSLER") bearing California License Plate 6YYF792, park next to the SATURN. Investigators saw three people get out of the SATURN, and get into the CHRYSLER. At approximately 9:35 a.m., investigators saw the CHRYSLER leave the parking lot of the hospital and followed it over various streets in El Centro.

3

15. From my training and experience, I know that subjects involved in alien smuggling will have one car pick up illegal aliens from the border area and then drive to another location to transfer the illegal aliens to another car. Alien smuggliers use this tactic to limit the amount of information about the smuggling activity that any one participant knows about the overall operation. The pattern of activity described in this affidavit is consistent with this kind of behavior.

16. At approximately 10:10 a.m., investigators following the vehicle saw the CHRYSLER park in the driveway of the SUBJECT PREMISES. The driver of the CHRYSLER, later identified as Karla QUINTERO, tried to to get out of the vehicle; when that happened, investigators approached her and identified themselves. They asked QUINTERO if she was transporting illegal aliens, but she did not answer. Investigators also saw three people sitting in the back seat of the CHRYSLER, trying to avoid eye contact and keeping their heads down. Investigators asked these passengers if they were in the United States legally; the three people, later identified as Victor Hugo Morales, Lizeth Alejandra Lopez, and Bertha Cruz, admitted that they did not have any documents granting them status or permission to be in the United States, and admitted they were illegally present in the United States.

17. At approximately 10:15 a.m., investigators placed QUINTERO, Morales, Lopez, and Cruz under arrest. Contemporaneously, investigators saw another person near the door of the SUBJECT PREMISES. Investigators instructed the individual to come towards them, but the individual ignored the investigators' commands and went into the SUBJECT PREMISES.

18. Based on the fact that they had just arrested QUINTERO on suspicion of alien smuggling after she parked the CHRYSLER containing three illegal aliens in the driveway of the SUBJECT PREMISES, investigators suspected that the SUBJECT PREMISES was being used as a stash house and feared that the individual who entered the SUBJECT PREMISES might try to destroy evidence of ongoing illegal activity. Therefore, investigators pursued the individual into the SUBJECT PREMISES, conducted a

4

protective sweep, and secured the entire property to allow investigators to seek issuance of the requested warrant.[1]

19. Following the sweep of the SUBJECT PREMISES, Morales, Lopez, and Cruz admitted that they had recently crossed into the United States illegally, and that they were going to pay $8,000 to be smuggled to Los Angeles, California. Investigators also learned that these individuals had been instructed by QUINTERO—the driver of the CHRYSLER—to get out of the CHRYSLER individually and enter the SUBJECT PREMISES.

20. Given that investigators found three illegal aliens in the CHRYSLER who were about to enter the SUBJECT PREMISES, the other facts in this affidavit, and based on my training and experience, I submit that there is probable cause to believe the SUBJECT PREMISES is a "stash house" being used in connection with alien smuggling and that there is probable cause to search the SUBJECT PREMISES, as further described in Attachment A, for the items described in Attachment B.

### Basis for Evidence Sought in Search Warrant

21. Based upon my knowledge, experience, and training in human smuggling investigations and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in human smuggling that occurs in furtherance of the criminal activity. I discuss these characteristics below:

    a. I am aware that individuals involved in human smuggling often maintain ledgers and other documents, in both physical and electronic format, such as correspondence, notes, appointment books, address books, telephone lists, Rolodexes, and telephone books, containing information regarding or relating to illegal aliens and their identities, and names of associates and/or arrangers involved in the smuggling of illegal

---

[1] Investigators did not seize any items while in the SUBJECT PREMISES, and in an abundance of caution, nothing that investigators observed while in the SUBJECT PREMISES is included in this affidavit.

5

aliens within the United States, including but not limited to, the names of illegal aliens, the illegal alien's destinations within the United States and/or fees paid or to be paid for illegal aliens to be brought into or transported or harbored within the United States;

   b. I am aware that individuals involved in human smuggling commonly earn income in the form of cash and often keep and maintain large amounts of bulk United States currency at their residences and load houses. Such funds are often used for everyday expenses and to maintain and finance their ongoing criminal activity.

   c. I am aware that individuals involved in human smuggling commonly maintain non-cash assets, such as negotiable instruments, stored value cards (prepaid telephone cards, retail "gift cards," and prepaid "check cards," for example), bank and business checks, money orders, traveler's checks, promissory notes, and cashier's checks, that are evidence of payments made or cash earned in conjunction with the bringing of illegal aliens into the United States and/or transportation of illegal aliens within the United States;

   d. I am aware that individuals involved in human smuggling commonly maintain financial records, such as credit card statements, canceled checks, deposit slips, orders for or receipts of money transfer by wire, checking and savings books, loan statements, tax returns, accounting records, investment or other similar documents, receipts, business records, money drafts passbooks, and other records of income and expenditure that are evidence of payments made or cash earned in conjunction with the bringing of illegal aliens into the United States and/or transportation of illegal aliens within the United States.

   e. I am aware that individuals involved in human smuggling commonly attempt to legitimize their profits earned from human smuggling activities. Individuals involved in human smuggling often amass and maintain assets at their residences and load houses which were purchased with the proceeds earned from such human smuggling. Individuals involved in human smuggling also attempt to secrete, transfer, and conceal the money by means, including, but not limited to: placing assets in names other than their own

to avoid detection while maintaining control; laundering the money through what appears to be legitimate businesses; hiding money in their homes, safes, and safety deposit boxes; smuggling money from the United States to a place outside thereof; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences and load houses of individuals involved in human smuggling. While this investigation has not revealed the existence of storage lockers or safety deposit boxes, if during the search we discover evidence of the existence of a storage locker or safety deposit box, we request permission to seize and search it;

   f. I am aware that individuals involved in human smuggling maintain documents showing possession, dominion, and/or control of premises used as load houses, including utility statements, telephone statements, deeds of trust, loan documents, mortgage documents, correspondence and rental agreements relating to the location to be searched;

   g. I am aware that individuals involved in human smuggling maintain personal identification documents that could include fraudulent, counterfeit, and/or altered documents used for illegal aliens who pose as imposters; more specifically, California Department of Motor Vehicle licenses and identification cards, domestic and foreign birth certificates, domestic and foreign passports and visas, including U.S. Passport Cards, Alien Registration Receipt Cards, Temporary Resident Cards, Employment Authorization Cards, Border Crossing Cards, Immigration Visas including I-551s (aka "Green Cards"), Social Security Administration Cards, other false registration documents or cards, and other false and official documents letters, or writing made to appear to have been created or issued by the United States Government or other official entities;

   h. I am aware that individuals involved in human smuggling maintain travel documents and/or correspondence, both domestic and foreign, relating to human smuggling arrangements and itineraries, including airline, hotel, or rental car records relating to the travel of illegal aliens, or relating to their own personal travel paid for and for the purpose of, or otherwise acquired by, proceeds of their human smuggling activities;

7

  i. I am aware that individuals involved in human smuggling maintain vehicle registrations of conveyances used to smuggle and transport illegal aliens. Individuals involved in human smuggling often drive vehicles that are registered in the names of other people or rental companies, or at alias addresses, and use these vehicles to transport illegal aliens and bulk United States currency;

  j. I am aware that individuals involved in human smuggling maintain property of smuggled illegal aliens including, but not limited to, wallets, purses, suitcases, tote bags, clothing, and identification documents;

  k. I am aware that it is common practice for alien smuggling organizations to use cellular telephones, two-way radios, and third-party smartphone applications to maintain communications with co-conspirators in furtherance of their criminal activities. Cellular telephones are essential for a Transnational Criminal Organization ("TCO"), as they are used to communicate between load drivers (*i.e.*, people driving illegal aliens for smuggling purposes), foot guides, smuggled illegal aliens, and the leadership of the organization. For example, it is common for a load driver to receive a telephone call on his or her cellular telephone from a member of the organization, telling the load driver where and when he or she should pick up a group of aliens near the United States / Mexico border. Cellular telephones contain electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of the Target TCO also utilize cellular telephones with photograph and video capabilities to take photographs and videos of other members of the TCO, illegal aliens, money, and assets purchased with illicit proceeds;

  l. I am aware that individuals involved in human smuggling use U.S. mail and private commercial delivery carriers to carry out transactions relating to alien smuggling;

  m. I am aware that individuals involved in human smuggling take and maintain photographs and videos of themselves and other members of the human

8

smuggling activities and of money and/or assets purchased or otherwise acquired with proceeds earned from human smuggling;

    n.    I am aware that individuals involved in human smuggling often have weapons, firearms, and ammunition in connection with the human smuggling activities, and keep weapons, firearms, and ammunition at stash houses; and

    o.    It is also my experience, opinion, and belief that the above-described documents and equipment are possessed by human smugglers much in the same way a legitimate business will maintain records, including tax returns and related documents, for an indefinite amount of time. These documents and equipment are kept by human smugglers whether or not the smuggler is harboring or transporting illegal aliens at any given moment.

## Procedures for Electronically Stored Information
## as to Any Computers and Other Electronic Storage Devices

22.    With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices (other than cellular telephones, which I describe separately), including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

    a.    After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer

forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive – the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

  b. If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five days of seizure absent further application to this court for an extension of time.

Identification and Extraction of Relevant Data

  c. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

  d. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be

reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – *e.g.*, who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

   e. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a

11

relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

        f.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

        g.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis

12

within one-hundred twenty (120) days of this warrant, absent further application to this court for an extension of time.

h. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**Procedures for Electronically Stored Information as to Any Cellular Telephones**

23. It is not possible to determine, merely by knowing a cellular telephone's make, model and serial number, the nature and types of services to which such a device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, law enforcement personnel will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data

contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court for an extension of time.

### Genuine Risk of Destruction of Data

28. Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data.

### Prior Attempts to Obtain Data

26. The United States has not attempted to obtain this data by other means.

### Request for Sealing

27. It is respectfully requested that this Court issue an Order sealing, with disclosure permitted to defendant's counsel pursuant to an early disclosure agreement or Fed. R. Crim. Proc. 16 or until further order of this court, all papers submitted in support of this Application, including the Application, Affidavit, Attachments and Search Warrant, and the requisite inventory notice. Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness. Specifically, I believe that execution of this search warrant may yield information relevant to a broader practice of alien smuggling, and believe that premature disclosure of this warrant could cause those people to alter or destroy evidence, or cease or change their patterns of behavior.

### Conclusion

28. Based on my training and experience, my review of reports, my discussions with other law enforcement officers, as well as all other facts discussed above, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalies of violations of 8 U.S.C. § 1324 may be located at the SUBJECT PREMISES, as further described in Attachment A. I, therefore, respectfully request that the attached warrant be issue authorizing the search of the location described in Attachment A and seizure of the items listed I Attachment B.

Emmanuel Ortega
Homeland Security Investigations TFO

SUBSCRIBED TO AND SWORN TO BEFORE ME THIS __19__ DAY OF OCTOBER, 2018.

HON. WILLIAM V. GALLO
United States Magistrate Judge

15

## ATTACHMENT A

## LOCATION TO BE SEARCHED

### *552 Hamlton Street, El Centro, California 92243*

The location to be searched, defined as the "SUBJECT PREMISES" in the attached affidavit, is a detached one-story tan house with a brown roof. The house is located on the north side of Hamilton Street, and the driveway is accessible from Hamilton Street. The perimeter of the house is enclosed by a metal fence, which is light brown and stands about four feet high. The house has a brick path that extends from the street to the area by the front door; this brick path also has a section extending from the parking area, visible in the photos below.

The house has a white metal screen door that faces Hamilton Street and opens outward. The screen door is hinged on the right with the door handles on the left side. The residence has the numbers "552" on the edge of the roof in line with the brick path and the white metal screen door, visible in the photos below.





## ATTACHMENT B

### *Items to Be Seized*

1.  The items to be seized are evidence of alien smuggling, in violation of Title 8, United States Code, Section 1324, and conspiracy to commit the same:

    a.  Lists containing names of associates and arrangers involved in alien smuggling, bringing illegal aliens into the United States, harboring illegal aliens, and transporting illegal aliens within the United States;

    b.  Lists, ledgers, logs, records, and other documents concerning the number of aliens smuggled into the United States from a place outside thereof, the number of aliens harbored, the number of aliens transported within the United States, and the amount of money paid and received for such smuggling activities;

    c.  Financial records, bank records, check books, money orders, money order receipts, U.S. currency, and foreign currency that may be proceeds of alien smuggling activities;

    d.  Documents showing possession, dominion, and/or control of the Subject Premises (described in Attachment A), including but not limited to utility bills and statements, telephone records, correspondence, mail, rental or lease agreements, real estate deeds, and other documents related to the Subject Premises;

    e.  Property of smuggled aliens in the form of wallets, purses, suitcases, tote bags, clothing, identification documents, and entry documents, which constitute evidence of harboring and smuggling illegal aliens;

    f.  Travel documents and correspondence, both domestic and foreign and both real and counterfeit, relating to alien smuggling arrangements and itineraries;

    g.  Vehicle registration documents of vehicles used in the smuggling and transportation of illegal aliens;

    h.    Passports and any United States Government documentation relating to the alienage of persons, both real and counterfeit;

    i.    Foreign passports and foreign identification documents relating to the alienage of persons, both real and counterfeit;

    j.    Airline/airfare tickets and tickets for other modes of transportation (such as buses and trains) relating to the travel of illegal aliens;

    k.    Cellular telephones and cellular telephone records that may be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, text messages and voice messages relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens;

    l.    Computers and electronic storage devices that may also be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, documents, emails, pictures, videos, and records relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens;

    m.    Two-way radios and two-way radio records that may be used by alien smugglers to communicate in areas with sparse cellular telephone coverage, AND

    n.    Weapons, firearms and ammunition.

As used throughout this list of items to be seized, the terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

2.   Authorization is sought to search for and seize evidence of the crimes described above in paragraph 1. This authorization includes the search of physical documents and includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the computer, cellular telephone or other electronic devices seized.

The seizure and search of any seized electronic devices will be conducted in accordance with the "Procedures For Electronically Stored Information" provided in the affidavit submitted in support of this warrant. The evidence to be seized from the electronic media, including cellular telephones, will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, including but not limited to the following:

   a.   All computer systems, software, peripherals and data storage devices.

   b.   All documents, including all temporary and permanent electronic files and records, relating to any and all of the items described in paragraph 1 above.

   c.   User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.